IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| AMERICAN RELIABLE INSURANCE COMPANY; UNITED NATIONAL INSURANCE COMPANY; AMERICAN SECURITY INSURANCE COMPANY; AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA; STANDARD GUARANTY INSURANCE COMPANY; FARMERS INSURANCE EXCHANGE; FIRE INSURANCE EXCHANGE; FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN; FOREMOST PROPERTY AND CASUALTY INSURANCE COMPANY; FOREMOST SIGNATURE INSURANCE COMPANY; ILLINOIS FARMERS INSURANCE COMPANY; MID-CENTURY INSURANCE COMPANY; TRUCK INSURANCE EXCHANGE; and NAUTILUS INSURANCE COMPANY; <br><br> *Plaintiffs* <br><br> v. <br><br> UNITED STATES OF AMERICA, the federal government, <br><br> *Defendant* | No. _____ |

## COMPLAINT

Plaintiffs, AMERICAN RELIABLE INSURANCE COMPANY; UNITED NATIONAL INSURANCE COMPANY; AMERICAN SECURITY INSURANCE COMPANY; AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA; STANDARD GUARANTY INSURANCE COMPANY; FARMERS INSURANCE EXCHANGE; FIRE INSURANCE EXCHANGE; FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN; FOREMOST PROPERTY AND CASUALTY INSURANCE COMPANY; FOREMOST SIGNATURE INSURANCE COMPANY; ILLINOIS FARMERS INSURANCE COMPANY; MID-CENTURY INSURANCE COMPANY; TRUCK INSURANCE EXCHANGE; and NAUTILUS INSURANCE COMPANY ("Plaintiffs"), by and through

Counsel, make the following Complaint ("Complaint") against the Defendant, UNITED STATES OF AMERICA ("Defendant" or "USA"):

## INTRODUCTION

1. Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, and 2671-2680 against the Defendant USA for damages arising from the negligent acts or omissions on the part of employees or agents of the Department of the Interior ("DOI") and/or National Park Service ("NPS") in response to the Chimney Tops 2 Fire in the Great Smokey Mountains National Park ("GSMNP" or "the Park").

## THE PLAINTIFFS

2. At all relevant times, Plaintiffs were entities authorized to conduct and transact business as insurance companies in Tennessee.

3. At all relevant times, Plaintiffs insured real property, personal property, businesses, and automobiles in and around Gatlinburg, Tennessee.

4. Plaintiffs' policyholders, identified in "Exhibit 1" of this Complaint, presented claims to the Plaintiffs for damage to their real property, personal property, businesses, and automobiles arising from the Chimney Tops 2 Fire.

5. Consistent with the Plaintiffs' policies of insurance, and Plaintiffs' obligations under the law, Plaintiffs investigated, adjusted, and paid, or will pay, their respective policyholders for damage to real property, personal property, businesses, and automobiles arising from the Chimney Tops 2 Fire. See Exhibit 1.

6. Under the terms, conditions, and provisions of each separate and respective policy of insurance, and by operation of law, Plaintiffs have become, or will become, equitably and legally subrogated to the claims, rights, and demands of each of its policyholders to the extent of the payments made and to be made.

7. The Plaintiffs now stand in the shoes of their policyholders and are entitled to initiate legal action against Defendant in this proceeding.

## THE DEFENDANT

8. Defendant is the United States of America ("USA").

9. The NPS is a component of the DOI and an agency of Defendant.

10. The NPS owns, manages, controls, operates and/or maintains the 417 parks of the National Park System, including the GSMNP.

11. All persons employed by the NPS are "employees of the [USA] government," as the term is defined in 28 U.S.C. § 2671.

12. At all times referred to herein, the USA, its agencies, employees and agents, whether named or unnamed herein, were acting under color of federal law, statutes, ordinances, regulations, policies, customs, practices and usages of the USA, pursuant to their authority thereunder.

13. Defendant can be served with process via the Attorney General, Mr. William Barr, III, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, or via J. Douglas Overbey, United States Attorney, Eastern District of Tennessee, United States' Attorney's Office, 800 Market Street, Suite 211, Knoxville, Tennessee 37902, both of whom are agents authorized to accept service of process for the USA.

## JURISDICTION AND VENUE

14. Plaintiffs submitted their claims for damages to the DOI on or around November 22, 2018, pursuant to the FTCA, 28 U.S.C. § 2671-2680. See Exhibit 2.

15. 28 U.S.C. § 2675 allows claimants (Plaintiffs) to file a lawsuit six (6) months after having received no response from the United States government to their claims for damages.

16. The USA failed to respond to Plaintiffs' claims for damages, much less resolve Plaintiffs' claims for damages within the permitted six (6) month period. All conditions precedent to

those claims under the FTCA have been satisfied, and Plaintiffs now bring this Complaint pursuant to the FTCA, 28 U.S.C. § 2671.

17. The claims asserted by Plaintiffs arise out of certain actions, omissions, and otherwise negligent conduct by employees of the DOI and/or NPS, a component of the DOI and authorized agent of the USA, which resulted in, among other things, substantial property losses incurred by Plaintiffs' insureds.

18. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1346(b).

19. Venue is properly within the Eastern District of Tennessee pursuant to 28 U.S.C. § 1402(b), as Plaintiffs' claims arose within this District, and the acts complained of occurred within this District.

**DUTIES AND RESPONSIBILITIES OF GSMNP OFFICIALS**

20. The Fire Management Officer ("FMO") of the GSMNP was responsible for oversight of the GSMNP's fire program. See Exhibit 3, Chimney Tops 2 Fire Review: Individual Fire Review Report (hereinafter "NPS Report"), at 8.

21. Upon information and belief, at all relevant times Greg Salansky ("Mr. Salansky"), in his role as the Appalachian-Piedmont Zone Fire Management Officer ("Zone FMO"), was acting FMO of the GSMNP.

22. The Duty Officer ("DO") was responsible for providing operational oversight for monitoring the Chimney Tops 2 Fire. In particular, the DO was responsible for ensuring compliance with NPS safety policies, as well as coordinating and setting priorities for suppression actions and resource allocation. [Exhibit 3, NPS Report, at 8].

23. Upon information and belief, as FMO, Mr. Salansky was also responsible for assigning an individual to act as the DO during the Chimney Tops 2 Fire.

24. Instead of following proscribed protocol and assigning an individual to act as the DO during the Chimney Tops 2 Fire, Mr. Salansky unilaterally decided to act as the DO himself. [Exhibit 3, NPS Report, at 2].

25. The Incident Commander ("IC") of the Chimney Tops 2 Fire was responsible for the overall management of the Fire and reporting to the Agency Administrator. [Exhibit 3, NPS Report, at 8].

26. Upon information and belief, the Agency Administrator ("AA"), in the case of the Chimney Tops 2 Fire, was GSMNP Superintendent Cassius Cash.

27. Upon information and belief, GSMNP Superintendent Cassius Cash was scheduled to be off work from November 23, 2016 to November 27, 2016, for the Thanksgiving Holiday. In Superintendent Cash's absence, Deputy GSMNP Superintendent Clayton Jordan served as "Acting" GSMNP Superintendent.

## BACKGROUND FACTS

28. On November 22, 2016, the National Weather Service declared Gatlinburg and the GSMNP to be in an "extreme" and "exceptional" drought condition. As a result, the risk of wildland fire was significant.

29. The following day, Wednesday, November 23, 2016, at about 5:00 P.M., a fire of less than one (1) acre was discovered near the top of the Chimney Tops Trail ("the Fire" or "Chimney Tops 2 Fire") by Mr. Salansky. [Exhibit 3, NPS Report, at 8].

30. Mr. Salansky initially attempted to contain the Chimney Tops 2 Fire using a hand tool, but he was unsuccessful and retreated. [Exhibit 3, NPS Report, at 8].

31. On Thursday, November 24, 2016, Mr. Salansky returned to the top of Chimney Tops Trail to investigate the Fire. See Exhibit 3, NPS Report, at 9-11.

32. Due to the Thanksgiving Holiday, most of the GSMNP fire staff was on leave. [Exhibit 3, NPS Report, at 9]. Mr. Salansky failed to request resources for additional staff. Id., at 10.

33. Mr. Salansky developed a plan to "contain" the Fire inside a 400-acre containment box utilizing natural features, including trails and a nearby creek, and constructed fire-lines to "hold the fire." [Exhibit 3, NPS Report, at 10].

34. Mr. Salansky delineated the 400-acre containment box using topographic natural barriers and relying on drainages to contain the Fire. A portion of the box located on the south and west side of Chimney Tops 2 required construction of a fire line. Ultimately, Mr. Salansky failed to construct the containment box. [Exhibit 3, NPS Report, at 10].

35. From Thursday, November 24, 2016, to Monday, November 28, 2016, in direct disregard of mandatory requirements, no overnight monitoring of the Chimney Tops 2 Fire occurred. See generally, Exhibit 3, NPS Report.

36. On Saturday, November 26, 2016, multiple weather advisories warned Mr. Salansky of worsening weather and wind conditions to occur on Monday, November 28, 2016. [Exhibit 3, NPS Report, at 12].

37. On Monday, November 28, 2016, predicted weather conditions caused the Chimney Tops 2 Fire to spread outside the "containment box" and outside of the GSNMP altogether, causing extensive destruction of real property, personal property, businesses, and automobiles of Plaintiffs' policyholders. [Exhibit 3, NPS Report, at 16-18].

## MONITORING IS MANDATORY

38. The Fire Monitoring Handbook ("FMH") is also known as DO #18: Wildland Fire Management (USDI NPS 1998). A copy of the FMH is attached to this Complaint as "Exhibit 4".

39. In accordance with the FMH, fire managers **must**, "[c]onsider the potential for the fire to leave a designated management zone, **impact adjacent landowners, threaten human safety**

**and property**, impact cultural resources, affect air quality, or threaten special environmental resources such as threatened, endangered or sensitive species." [Exhibit 4, FMH, at 10] (emphasis added).

40. The FMH outlines standardized methods to be used throughout the NPS for documenting, monitoring, and managing all wildland fires. These standardized methods are **mandatory** and must be followed. *See generally* Exhibit 4, FMH.

41. During the Initial Assessment phase of a fire, fire managers must determine the fire cause and location, **and monitor fire size, fuels, spread potential, weather, and smoke characteristics**. Fire managers must also address particular threats and constraints regarding human safety, cultural resources, and threatened or endangered species or other sensitive natural resources relative to the suppression effort (especially fire-line construction), and work collaboratively with other Park staff and inter-agency staff to address goals and objectives outlined in government agency policies, manuals, directives, etc. [Exhibit 4, FMH, at 9].

42. NPS Reference Manual 18, also **commands** fire managers to monitor all fires. [NPS Reference Manual 18, Chapter 2 Wildland Fire Management, at 9] ("All wildland fire events **must** be monitored."). A copy of the NPS Reference Manual 18 is attached to this Complaint as "Exhibit 5".

43. Specifically, fire managers must monitor wildland fires in order to:

> "Provide managers with information essential for decision making; Determine whether fire management program objectives are being met; Ensure protection of human life, property, and natural and cultural resources; Determine the effectiveness of the planned strategy; assist with contingency planning; Increase knowledge of fire behavior and effects on park ecosystems; Provide long-term documentation for actions taken on a wildland fire; [and] Identify human health and safety concerns from wildland fire."

[Exhibit 5, NPS Reference Manual 18, Chapter 2 Wildland Fire Management, at 9].

44. For *five consecutive nights*—from Wednesday, November 23, 2016 through Sunday, November 27, 2016—Mr. Salansky and GSMNP officials failed to monitor the Chimney Tops 2 Fire

in the overnight hours. *See generally*, Exhibit 3.

45. Proper monitoring of fire-behavior and spotting during the overnight hours on Sunday, November 27, 2016 to Monday, November 28, 2016, would have provided valuable insight into the growth pattern and potential for the Chimney Tops 2 Fire to escape the Park. Furthermore, proper monitoring would have provided Mr. Salansky and GSMNP officials sufficient time to notify local residents and local officials of the growth pattern and potential for the Chimney Tops 2 Fire to escape the Park.

## **WARNING IS MANDATORY**

46. GSMNP's own Fire Management Plan ("FMP") mandates that Park officials must notify Park neighbors—including local government officials, local residents and Park visitors—of all planned and unplanned fire management activities that have the potential to impact them. A copy of the FMP is attached to this Complaint as "Exhibit 6".

47. Specifically, the FMP provides:

> "Park neighbors, Park visitors and local residents will be notified of **all planned and unplanned fire management activities that have the potential to impact them**."

[Exhibit 6, FMP, 3.3.2, at 28] (emphasis added).

48. The FMP further **mandates** that fire managers take actions to mitigate the risks to the neighboring public. Specifically, these, "mitigation actions [are] required to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public." [Exhibit 6, FMP, 4.4.2, at 54].

49. With respect to "Park neighbors" and "neighboring public" those actions include:

- Post current fire information on websites as available;
- Inform park neighbors of wildland fires; and
- Suppress those fires or parts thereof that threaten to burn off of park property or that adversely impact public health and safety.

[Exhibit 6, FMP, 4.4.2, at 55].

50. Mr. Salansky and the GSMNP officials took no action to warn local officials and residents of danger until Monday, November 28, 2016, the day the Fire left the GSMNP. [Exhibit 3, NPS Report, at 35].

51. If Plaintiffs' insureds and/or local government agencies and local fire agencies had received timely notice of the risk of the Chimney Tops 2 Fire expanding into their communities, they could have taken precautionary actions, including but not limited to: (1) removing their most valuable property to a safer location; and (2) preparing their properties for lower fire spread risk (*e.g.*, cutting back tree limbs, drenching the exterior of their homes with water, digging their own fire lines, etc.).

## **MANDATORY COMMAND STRUCTURE**

52. Wildfires are categorically typed by complexity, from Type 5 (least complex) to Type 1 (most complex).

53. The Interagency Standards for Fire and Fire Aviation Operations in effect at the time of the Chimney Tops 2 Fire (hereinafter, the "Redbook"), a copy of which is attached to this Complaint as "Exhibit 6", provides that, "[a]ll wildfires, regardless of complexity, will have an Incident Commander ("IC"). [Exhibit 7, Redbook, at 208].

54. The IC is a single individual responsible to the Agency Administrator(s) for 23 different incident activities. [Exhibit 7, Redbook, at 208].

55. Upon information and belief, additionally, DO coverage must also be implemented during periods of anticipated prolonged fire damage.

56. Under the Park's FMP, the IC is responsible for performing a strategic fire assessment, including an evaluation of (1) the conditions and circumstances under which a fire occurs; (2) the likely consequences to firefighter and public safety; (3) natural and cultural resources; and (4) the values to be protected. The assessment of the foregoing dictated the IC's response and management strategy for the Fire. [Exhibit 6, FMP, at 45].

57. The Park's FMP requires the IC to relay the size-up and planned strategy and tactics *to both the FMO and the DO*, who must initiate the Wildland Fire Decision Support System ("WFDSS") process and notify the Park's Fire Management Committee. [Exhibit 6, FMP, 4.1.2, at 45] (emphasis added).

58. To maintain fire-management policy oversight, the Redbook strictly prohibits a single person from holding the positions of IC and DO simultaneously. [Exhibit 3, NPS Report, at 36].

59. The Redbook further prohibits an IC from holding concurrent management duties, such as functioning as the Zone and Park FMO and DO. [Exhibit 3, NPS Report, at 36].

60. Further, under Redbook policies, a DO may not fill any incident-command function connected to any incident. [Exhibit 6, FMP, Table 6, at 40; Exhibit 3, NPS Report, at 31].

61. Under NPS policy and the FMP, three different people should have been running the fire-management operation: the FMO, who oversees the big picture; an overall IC; and an on-scene DO. [Exhibit 3, NPS Report, at 36].

62. Mr. Salansky, in his role as the Appalachian-Piedmont Zone Fire Management Officer ("Zone FMO"), was responsible for the GSMNP. [Exhibit 3, NPS Report, at 53].

63. As Zone FMO, Mr. Salansky was also the FMO for the GSMNP. [Exhibit 3, NPS Report, at 30].

64. After the Chimney Tops 2 Fire was discovered on Wednesday, November 23, 2016, upon information and belief, Mr. Salansky unilaterally decided that he would act as the IC for the Chimney Tops 2 Fire.

65. As the IC, Mr. Salansky was responsible for establishing the appropriate organizational structure for the Fire and managing the Fire based on his qualifications, incident complexity, and span of control. [Exhibit 7, Redbook, at 231].

66. Upon information and belief, as FMO, Mr. Slanasky was also responsible for assigning an individual to act as the DO during the Chimney Tops 2 Fire.

67. Upon information and belief, instead of assigning an individual to act as the DO during the Chimney Tops 2 Fire, Mr. Salansky unilaterally decided to act as the DO himself.

68. Mr. Salansky violated the NPS policy and the FMP by unilaterally deciding to function in all five critical command positions: Zone FMO, Park FMO, IC, the DO, as well as that of Safety Officer—in a direct contradiction to mandates outlined in the Redbook.

69. Upon information and belief, the Park's senior leadership did not question or oppose Mr. Salansky's self-designation to act as all five critical command positions at any time during the Chimney Tops 2 Fire. [Exhibit 3, NPS Report, at 9, 36, 53].

70. Upon information and belief, if Mr. Salansky had designated others to be the IC or DO from Park personnel or elsewhere, the required process would likely have produced policy oversight and the system of checks and balances required and necessary to assess and manage the fire-suppression response and make fire-related decisions.

71. Mr. Salansky directly violated the mandated directives set forth in the NPS and FMP. As a result, Mr. Salansky was unable to manage all the tasks required of each separate role, resulting in the complete failure to contain the Fire within the GSMNP.

72. As a result of the violation of mandated command-structure requirements by Mr. Salansky and Park leaders, acting within the course and scope of their employment, the Chimney Tops 2 Fire escaped from GSMNP.

**MANDATORY USE OF WFDSS**

73. The Wildland Fire Decision Support System ("WFDSS") is a web-based program which must be used to assess and document the response to a wildfire. [Exhibit 6, FMP, at 65; Exhibit 3, NPS Report, at 36-37].

74. WFDSS assesses and documents response to wildfires in the following manner: (1) describes and analyzes the fire situation; (2) develops incident objectives and requirements; (3) develops a course of action; (4) evaluates relative risk; (5) completes an organization assessment; (6) documents the rationale; and (7) publishes a decision. [Exhibit 3, NPS Report, at 36-37].

75. A WFDSS decision provides and includes the following critical information:

   a. Incident. This includes name, unique identifier, responsible agency, location, and discovery date/time.

   b. Situation. Multiple mapping layers can display how fire perimeter growth impacts landscape values or points of interest. Incident owners can run Basic and Short Term Fire Behavior analyzes, view objectives, Energy Release Component (ERC) graphs, and/or current weather.

   c. Objectives. The incident owner designates incident-specific objectives and requirements that satisfy guidance found in Strategic Objectives and Land Management Plans.

   d. Course of Action. The incident owner develops a strategic plan to manage the fire. This includes cost estimates and any additional actions required to implement the strategic plan.

   e. Cost. Estimated Final Cost can be documented as well as the cost estimation method used to derive it.

   f. Decision List. The incident owner reviews/edits the list of reviewers and approvers, creates and checks in the decision, and submits it for review and/or approval.

76. WFDSS decisions are critical in that they document fire management strategies, estimated costs relative to fire management, and ensure that strategic plans to manage a fire are subject to oversight as well as checks and balances.

77. Publishing a WFDSS decision ensures that a fire incident is managed using the latest science, relative risk assessments, and fire model data. In addition, publishing a WFDSS decision ensures fire management plans are subject to oversight.

78. The GSMNP FMP states that the use of WFDSS on each fire is mandatory. [Exhibit 6, FMP, at 30; Exhibit 3, NPS Report, at 37].

79. In addition, the following direction appears in NPS Reference Manual 18:

> Parks **will** use the current decision support process (e.g. Wildland Fire Decision Support System, WFDSS) to guide and document wildfire management decisions. The process will provide situational assessment, analyze hazards and risk, define implementation actions, and document decisions and rationale for those decisions.

[Exhibit 5, NPS Reference Manual 18, at 10-11].

80. According to the NPS Report, "[GSMNP] leadership was unaware of Redbook requirements that WFDSS be applied to all fires within park boundaries." [Exhibit 3, NPS Report, at 38].

81. The NPS Report also found GSMNP administrative personnel were not trained in WFDSS. [Exhibit 3, NPS Report, at 38].

82. WFDSS should have been activated by Mr. Salansky prior to Monday, November 28, 2016.

83. By failing to utilize WFDSS in a timely manner, and publish the required WFDSS decisions in a timely manner, GSMNP personnel, including Mr. Salansky, neglected to perform situational assessments, to analyze hazards and risks, document decisions, as well as the rationale for

those decisions, and to ensure that the strategic plan and all related decisions were subject to the appropriate oversight, checks, and balances.

84. These failures substantially contributed to the inability to suppress and/or contain the Chimney Tops 2 Fire before it left the Park, as appropriate ongoing assessments—along with recognition of command-control functions—would have demanded significant additional suppression resources to put out the Fire.

## NEGLIGENT FIRE SPREAD

85. Plaintiffs re-allege all preceding paragraphs as though fully set forth herein.

86. Defendant is liable for tort actions in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. §§ 1346(b), 2674.

87. Tennessee law provides that a party is negligent when there is, "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

88. Defendant, as owner of the GSMNP, owed a duty to prevent a dangerous condition on Park property—the Chimney Tops 2 Fire—from escaping the Park and causing injuries to property outside the Park, including the property of Plaintiffs' insureds.

89. Defendant breached its duty by:

    a. failing to adhere to mandatory fire management policies and requirements;

    b. failing to comply with mandatory wildfire management policies and requirements that compel Park fire managers to monitor any wildfire on their land, including, but not limited to, DO #18, NPS Reference Manual 18, the GSMNP's FMP, the Interagency Standards for Fire and Fire Aviation Operations (the "Redbook"), the Fire Monitoring Handbook ("FMH"), and other written or settled fire management

      policies, procedures, rules, regulations and guidelines;

  c.    failing to comply with mandatory wildfire management policies and requirements that compel Park fire managers to notify park neighbors of fire management activities that have the potential to impact them;

  d.    failing to provide mandatory notice and warning to Park neighbors, local government officials, local fire departments, local residents and visitors about the status of and imminent danger presented by the Chimney Top 2 Fire;

  e.    failing to adhere to mandatory command structure requirements; and

  f.    failing to utilize the mandatory Wildland Fire Decision Support System ("WFDSS"), which would have prompted (1) periodic assessments of the ongoing effectiveness and (2) re- evaluation of suppression-strategies; and (3) oversight of fire management and suppression strategies.

90. As a result of these negligent acts or omissions by Mr. Salansky and Park Leaders, acting within the course and scope of their employment, in violation of mandatory directives, Plaintiffs' policyholders suffered extensive property damage, including damage or destruction of their real property, personal property, businesses, and automobiles.

## **PRAYER FOR RELIEF**

Now having fully stated their causes of action, Plaintiffs would move the Court to grant the following relief:

  a.    That a summons be issued against the Defendant;

  b.    That the Court award Plaintiffs compensatory, consequential, and incidental damages in amounts to be proven at trial, pre-judgment interest, post-judgment interest, and any and all actual relief to which Plaintiffs may be entitled in an amount not less than $200,000,000.00;

  c.    That Plaintiffs be awarded their reasonable attorney's fees and costs in this action, including expert and accounting fees, pursuant to Tennessee Code Annotated Section 29-16-123;

  d.    That a jury of Plaintiffs' peers be seated for the trial of this matter; and

  e.    That the Court award such other relief as it deems appropriate.

Respectfully submitted, this the 18th day of November 2019.

**KAY GRIFFIN LLP**

/s/Matthew J. Evans
Matthew J. Evans BPR #017973
Michael A. Johnson    BPR #030210
900 South Gay Street, Suite 802
Knoxville, TN 37902
(865) 314-8422