# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

AMERICAN RELIABLE INS. CO.,
*et al.*,

       Plaintiffs,

v.

UNITED STATES OF AMERICA,

       Defendant.

No. 3:19-cv-00469-JRG-HBG
Hons. Greer/Guyton

**DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## INTRODUCTION

Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, seeking damages for injury or loss of property sustained by their insureds as a result of a wildfire that started in the Great Smoky Mountains National Park in November 2016 (hereinafter, "the Chimney Tops 2 Fire" or "the Fire").

This Court lacks subject matter jurisdiction over Plaintiffs' claims, which are barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). Decisions made by the National Park Service ("NPS" or "Park Service") regarding how to suppress a wildland fire and to inform the public about those efforts involve policy considerations and thus those actions fall squarely within the discretionary function exception. Indeed, those decisions – which involve myriad judgments about strategy, tactics, resource allocation, and public and firefighter safety – are classic discretionary judgments that courts traditionally have refused to second-guess. The policies Plaintiffs cite do not set forth mandatory or specific directives. Instead, such policies reflect and encourage the flexibility in judgment-making necessary to fight fires.

For purposes of this motion, this Court may assume that the facts alleged by Plaintiffs in the Complaint are true. Even so, Plaintiffs' claims fall within the discretionary function exception. Congress made clear in enacting the discretionary function exception that FTCA lawsuits may not be used to second-guess policy-based, discretionary decision-making by federal agencies or employees. The firefighting and public information efforts undertaken by the Park Service in the course of the Chimney Tops 2 Fire entailed precisely the kind of policy-based judgments Congress intended to shield. Accordingly, this Court should dismiss this action in its entirety.

1

## BACKGROUND

On the evening of Wednesday, November 23, 2016 – the day before Thanksgiving – the Park Service discovered a small wildfire among dense vegetation on the north spire of the Chimney Tops, a steep 4,800-foot peak on Sugarland Mountain in the Great Smoky Mountains National Park. Complaint ("Compl."). ¶ 29. The Chimney Tops is a popular visitor destination located approximately five and one half miles south of Gatlinburg. The fire was detected by NPS Fire Management Officer ("FMO") Greg Salansky and another firefighter. *Id.* ¶ 29; Chimney Tops 2 Fire Review Individual Fire Review Report ("NPS Report"), ECF 1-4, p. 8.[1] The fire was small – approximately an acre in size – but on a treacherously steep hill too dangerous to send firefighters onto. *Id.* ¶ 29; ECF 1-4, pp. 8-9. Accordingly, Salansky closed the Chimney Tops Trail, and the Park Service issued a press release and other public information describing the fire and announcing trail closures. ECF 1-4, pp. 8-9.

On Thanksgiving morning, after scouting the fire, Salanksy began planning an indirect attack on the fire. *Compl.* ¶¶ 31-33. He devised a 410-acre "containment box" that employed natural and man-made barriers, including constructed fire lines. *Id.* ¶¶ 33-34. The next day, Friday, the fire was still small and slow-growing, less than two acres in size. ECF 1-4, pp. 10-12. NPS firefighters scouted the containment box's perimeter to establish its lines. *Id.*.

On Saturday morning, November 26, the National Weather Service issued a forecast predicting rain and stronger winds in the area starting Sunday and continuing into Monday. Compl. ¶ 36. Efforts to scout the fire – which remained small – and assess the containment area continued. *Id.* ¶¶ 87-89; ECF 1-4, pp. 12-13.

---

[1] The NPS Report was incorporated by Plaintiffs in their Complaint. *See* Compl. ¶ 20.

Case 3:19-cv-00469-JRG-HBG   Document 34-1   Filed 02/07/20   Page 3 of 27   PageID #: 1399

On Sunday morning, November 27, Salansky determined that the fire had become more active and had grown between six and ten acres in size. ECF 1-4, p. 14. He requested additional interagency resources, consisting of additional ground firefighting crews and air support to drop water on the fire. Ground firefighting support arrived, and air drops occurred until dark. *Id.* The Park Service issued information about the fire to the public and others. Compl. ¶ 50; ECF 1-4, pp. 9, 34-35.

In the early overnight hours from Sunday into Monday, November 28, the weather took a dramatic turn. Compl. ¶ 37; ECF 1-4, pp. 16-18. A weather formation known as a "mountain wave" brought hurricane-force winds up over the Chimney Tops, which crashed down along the mountainside and spread embers of the fire to other parts of the Park. ECF 1-4. When firefighters returned at sunrise on Monday, they discovered that the fire had become more intense and had grown swiftly. ECF 1-4, p. 43. Salansky conferred with Park management and immediately began requesting more interagency fire crews, air support, and a complex fire incident management team ("IMT") to the scene. *Id.*, pp. 16-18. Later that morning, Salansky spoke with the Chief of the Gatlinburg Fire Department ("GFD") about the growing fire. *Id.*, pp. 18-19. When a fire was later spotted at a pavilion area in the Park, the Park Service again contacted GFD and requested assistance. *Id.*, p. 22.

In the following hours, as the fire rapidly spread in an unprecedented manner, there was a flurry of activity by the Park Service. Additional firefighting resources were ordered and NPS staff worked with GFD and other officials to combat the fire and inform the public. *Id.*, at pp. 23-24. Despite the efforts of NPS and GFD firefighters and other officials, by late afternoon on Monday the fire reached and then spread beyond the Park borders into Gatlinburg and Sevier County. *Id.*; Compl. ¶ 37.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). A Rule 12(b)(1) motion can challenge the sufficiency of the pleading itself (a facial challenge) or the factual existence of subject matter jurisdiction (a factual challenge). *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

In this case, the United States facially challenges each of the legal claims of the Complaint. A facial attack tests whether the plaintiff has alleged a basis for subject matter jurisdiction, and the allegations of the complaint are taken as true for the motion. *Cartwright*, 751 F.3d at 759. The burden is on the plaintiff to plead sufficiently to demonstrate that his claim does not "clearly fall within" the discretionary function exception. *Carlyle v. Dept. of the Army*, 674 F.2d 554, 556 (6th Cir. 1982).

## ARGUMENT

### A.      Overview of the Discretionary Function Exception

The FTCA is a limited waiver of sovereign immunity that allows suits against the United States for an injury caused by the negligent or wrongful act of a federal employee, acting within the scope of employment, under circumstances where the United States, if a private person, would be liable under State law where the tort occurred. 28 U.S.C. § 1346(b)(1). The United States is immune from liability absent its consent, and the terms of that consent define a court's jurisdiction in such cases. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). Absent the United States' consent to suit through a clear waiver, sovereign immunity bars a suit against the federal government for lack of subject matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471,

475-76 (1994).

An exception to the FTCA's waiver of sovereign immunity is the discretionary function exception. That provision bars "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception protects "governmental actions and decisions based on considerations of public policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991).

Application of the discretionary function exception involves a two-prong test. First, the court must determine whether the act "involve[s] an element of judgment or choice." *Gaubert*, 499 U.S. at 322. Pursuant to the first prong, the court looks to whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. . . ." *Id*. at 322–23 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997). The directive must not only be mandatory, but also require that an action be taken "in [a] *specific* manner." *Rosebush*, 119 F.3d at 442 (emphasis in original).

Second, if the challenged conduct does involve judgment or choice, the court then must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. "The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-37. The Sixth Circuit has recognized that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are

*susceptible to policy analysis*." *Gaubert*, 499 U.S. at 325 (emphasis added); *Rosebush*, 119 F.3d at 443. Furthermore, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be *presumed* that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324 (emphasis added).

### B. The Park Service's Actions are Shielded by the Discretionary Function Exception

Plaintiffs broadly allege that the Park Service was negligent in acting to suppress the Chimney Tops 2 Fire by insufficiently monitoring it (Compl. ¶¶ 38-45); not complying with command structure requirements (Compl. ¶¶ 52-72); not using the Wildland Fire Decision Support System ("WFDSS") (Compl. ¶¶ 73-84); and failing to issue timely notice and warning to Park neighbors, local government officials, local fire departments, local residents, and visitors about the status and imminent danger presented by the Chimney Tops 2 Fire. (Compl. ¶¶ 46-51).

Plaintiffs' claims challenge firefighting decision-making that is widely-recognized as demanding judgment and choice (as reflected in the policies upon which Plaintiffs rely), and which necessarily involves the balancing of policy considerations. Accordingly, courts in this circuit and elsewhere have held that a federal agency's firefighting activities fall within the discretionary function exception. As one court in this circuit explained, "[i]n fire protection and firefighting, the situation faced . . . can vary widely depending on changing weather conditions, availability of personnel, availability of equipment, the condition of the forest, the presence of buildings, and probably other factors as well." *Mich. Dep't of Nat. Res. v. United States*, No. 2:11-cv-303, 2012 WL 13028277 at *6 (W.D. Mich. May 29, 2012). Accordingly, "personnel need to be free to make timely firefighting decisions to deal with changing conditions without being tied down by preexisting regulations or second guessing in subsequent litigation. This is

6

precisely the kind of governmental action that the discretionary function exception protects."[2] These pronouncements demonstrate that fire management activities are broadly protected by the discretionary function exception. Plaintiffs do not challenge any conduct in this case that falls outside the scope of the exception.

1. **The First Prong of the *Gaubert* Test: Plaintiffs' Claims Challenge Conduct that Involves Elements of Judgment and Choice**

Under the first prong of the *Gaubert* test, the Sixth Circuit has explained that "[i]t is the governing administrative policy, not the [agency's] knowledge of danger, that determines whether certain conduct is mandatory for purposes of the discretionary function exception." *Rosebush*, 119 F.3d at 442 (quoting *Autery v. United States*, 992 F.2d 1523, 1528 (11th Cir. 1993)). Thus, this Court must look to the Park Service's policies to determine if the first prong is satisfied.[3]

The policies cited throughout and attached to and incorporated into Plaintiffs' Complaint demonstrate that the Park Service's decision-making when fighting wildfires requires judgment.

---

[2] Other courts are in accord that the discretionary function applies to fire suppression efforts. *See*, *e.g.*, *Backfire 2000 v. United States*, 273 F. App'x 661 (9th Cir. 2008); *Luther v. United States*, No. 2:11-cv-268, 2014 WL 1255292 (D. Utah. March 26, 2014); *McDougal v. U.S. Forest Service*, 195 F. Supp. 2d 1229 (D. Or. 2002); *Parsons v. United States*, 811 F. Supp. 1411 (E.D. Cal. 1992). In other contexts, the Sixth Circuit has recognized that a federal agency's decisions about how to allocate personnel and resources falls within the discretionary function exception. *See*, *e.g.*, *A.O. Smith Corp. v. United States*, 774 F.3d 359, 371 (6th Cir. 2014) (allocation of personnel); *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (allocation of limited agency resources are "the very 'public policy' discretionary judgments Congress intended to shield from liability under section 2680(a)").

[3] Plaintiffs cannot collapse the discretionary function inquiry into a question of negligence. The discretionary function exception applies *even if* the agency's conduct was negligent. "Negligence [] is irrelevant to [the discretionary function exception] inquiry." *Rosebush*, 119 F.3d at 442. "If the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability." *Parsons v. United States*, 811 F. Supp. 1411 (E.D. Cal. 1992) (internal quotation omitted).

7

Plaintiffs cite supposedly mandatory provisions from five sources: (1) Reference Manual 18 ("RM-18"), (2) the Great Smoky Mountains National Park Fire Management Plan ("FMP"), (3) Director's Order # 18 ("DO-18"), (4) the Fire Monitoring Handbook ("FMH"),[4] and (5) the Interagency Standards for Fire and Fire Aviation Operations (commonly called the "Redbook"). However, these policies were not intended to constrain discretionary decision-making in fighting fires and thus do not defeat application of the discretionary function exception.

> **a.      The cited policies do not contain mandatory and specific directives, but instead afford discretion and judgment in fire management decision-making.**

Each of the NPS documents upon which Plaintiffs rely afford the kind of discretion and flexibility necessary in fire management decision-making.  For example:

DO-18:      The first sentence provides that "[t]his [DO] states the basic *principles* and strategic *guidelines* governing the management of wildland fire by the [NPS]."  DO-18 at 1 (emphasis added).

"The circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare…*dictate the appropriate response to the fire*."  *Id.* at 5 (emphasis added).

"[DO-18] is intended to improve the internal management of the NPS and is not intended to, and does not create any right or benefit, substantive or procedural, enforceable by law, or equity, by a party against the United States..."  *Id.* at 3.

RM-18:      "[RM-18] is intended to be read in its entirety.  While certain chapters or sections provide important *guidance* by themselves, there is an interrelationship among the chapters that provides clarity and continuity for the management of wildland fire ..."  RM-18, ECF 1-6 at 5 (emphasis added).

"[RM-18] provides NPS field employees legal references, operating policies, standards, procedures, general information, recommendations, and examples to assist them in carrying out Management Policies and Director's Orders."  *Id.* at 5.

---

[4] Plaintiffs incorrectly allege that the Fire Monitoring Handbook "is also known as DO #18: Wildland Fire Management."  Compl. ¶ 38.  They are different documents.  The Fire Monitoring Handbook is attached to Plaintiffs' Complaint.  *Id.*  However, DO-18 is not attached to the Complaint.  DO-18 is publicly available at https://www.nps.gov/policy/DOrders/DO_18.pdf.

8

"[RM-18] represents the most detailed and comprehensive *guidance* on implementing Service-wide wildland fire management policy for the National Park Service." *Id.* at 11 (emphasis added).

FMP:   "This Fire Management Plan provides long-term direction for achieving park *goals* related to human safety and ecosystem management…This plan outlines those actions that will be taken by Great Smoky Mountain National Park in meeting the fire management *goals* for the park . . . .[T]his plan will help achieve resource management *objectives* . . ." *Id.* at 5.

"When the objective is to put the fire out, *wildfire managers may apply different strategies and tactics as part of the fire response*. Aggressive suppression may be the preferred strategy for one portion of the perimeter, and on another portion of the perimeter point protection or monitoring may be the desired strategy. By taking into account the fire season, current and expected weather, current and anticipated fire behavior, fire managers can apply the best tactics to mitigate risks to the public and firefighters..." FMP, ECF 1-7 at 30 (emphasis added).

"Beginning with the initial action to any wildfire, decisions will reflect the *goal* of using available firefighting resources to manage the fire in the safest, most effective, and most efficient means available while meeting identified fire management unit *goals* and *objectives*." *Id.* (emphasis added).

"Wildfires may be managed for multiple objectives and *strategy and tactics can vary over space and time*." *Id.* at 45 (emphasis added).[5]

FMH:   The purpose of the handbook is to "ensure that management *objectives* are being met" and "to provide *guidance* that can prevent fire management problems from developing." FMH, ECF 1-5 at 3 (emphasis added).

"Depending on a park's management *objectives*, *a park may need a specific monitoring design beyond or instead of the design covered in this handbook*." *Id*. (emphasis added).

*Neither DO-18 nor RM-18 describes how monitoring is to be done*. This handbook provides that *guidance* by outlining standardized methods to be used throughout the National Park Service for documenting, monitoring, and managing both wildland and prescribed fires. *Id*. at 13 (emphasis added).

---

[5]   Additionally, the sections in the FMP's Introduction and regarding wildland fire management are phrased in terms of *goals* and *guidance*. *See, e.g.*, ECF 1-7 at 6 ("1.1 GRSM Wildland Fire Management *Goals*"); *id*. (emphasis added) ("1.2 Strategy to Achieve Wildland Fire Management *Goals*"); Section 4, which governs wildland fire suppression efforts, is titled, "4 Wildland Fire Operational *Guidance*." *Id*. at 29 (emphasis added).

9

Redbook: "The principles of fire suppression action provide a framework for developing fire suppression strategy and for conducting fire suppression operations. Again, *these are not absolute or immutable rules*." Redbook, ECF 1-8 at 34.

"The primary means by which we implement command decisions and maintain unity of action is through the use of common *principles* of suppression operations. These principles *guide* our fundamental fire suppression practices, behaviors, and customs, and are mutually understood at every level of command. . . . *They are not absolute rules. They require judgment in application*." *Id.* at 34.

"The principles of fire suppression action provide a *framework* for developing fire suppression strategy and for conducting fire suppression operations. *Again, these are not absolute or immutable rules*." *Id.*

Courts consistently have concluded that principles, objectives, goals, and guidelines do not supply mandatory directives. *See e.g.*, *Luther*, 2014 WL 1255292 at *4 ("objectives" not mandatory); *Terbush v. United States*, 516 F.3d 1125, 1137 (9th Cir. 2008) (guidelines not mandatory); *Riley v. United States*, 486 F.3d 1030, 1033 (8th Cir. 2007) (document describing itself as "guidance" and "reference manual" not mandatory); *K.W. Thompson Tool Co. v. United States*, 836 F.2d 721, 729 (1st Cir. 1988) ("guidance"); *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995) ("guidelines" considered mandatory "only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions."); *OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir. 2002) ("objectives" and "principles" not mandatory).

None of the policies identified by Plaintiffs supplies mandatory directives binding upon the Park Service. Rather, they set forth, as the agency intended, guidance, goals, or objectives that vest Park Service employees with the discretion necessary when managing and fighting wildfires. Accordingly, such policies fail to remove Plaintiffs' claims from the scope of the discretionary function exception.

However, even if this Court were to find that the policies cited are mandatory, the provisions identified by Plaintiffs do not overcome the discretionary function exception because

they are not sufficiently specific.  To overcome the exception, a provision must not only be mandatory, but it must also be specific so as to eliminate any discretion.  *See Rosebush*, 119 F.3d at 442; *Autery*, 992 F.2d at 1527.  As one court noted, "The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion."  *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998) (while firefighting policies "outline certain requirements for fire suppression, they do not eliminate discretion because *they do not tell firefighters how to fight the fire*.").  *Gaubert's* first prong is satisfied with respect to the conduct challenged in the Complaint.

### i. Overnight Monitoring (Compl. ¶¶ 38-45)

There are no mandatory and specific directives in DO-18, RM-18, or the Fire Monitoring Handbook requiring that the Park Service conduct overnight monitoring, as Plaintiffs allege. Compl. ¶ 38-43.  DO-18 gives firefighters discretion to manage fires "through application of the *appropriate strategic* and *tactical* management *options*."  DO-18 at 3 (emphasis added).  Further, although RM-18 provides that "[a]ll wildland fire events must be monitored," ECF 1-6 at 8, it does not mandate *overnight* monitoring, or even *how* or *when* monitoring should occur.  Such decisions are left to the sound judgment of NPS fire management officials.

The Fire Monitoring Handbook – which itself explicitly states that "[n]either DO-18 or RM-18 describes how monitoring is to be done," ECF 1-5, at most advises Park Service employees to "monitor fire size, fuels, spread potential, weather, and smoke characteristics." The FMH provides that "*Recommended Standards* are given here."  *Id.* at 20 (emphasis added). Even if this Court were to consider the FMH provision mandatory, the Handbook's language is insufficiently specific to defeat the discretionary function exception because it does not prescribe *when* or *how* the Park Service is to perform monitoring.  And there is no provision mandating

*overnight* monitoring. Again, the Park Service is given broad discretion in the Handbook regarding how to conduct monitoring efforts. Thus, the discretionary function exception shields the Park Service's monitoring activities.

### ii. Command Structure (Compl.¶¶ 52-72)

Plaintiffs cite the Redbook and the FMP for the proposition that mandatory directives prohibited a single person from simultaneously holding the position of Incident Commander ("IC") and Duty Officer ("DO") for the Chimney Tops 2 Fire. Compl. ¶¶ 57-60. Salansky assumed the position of IC upon the fire's discovery. Compl. ¶ 64. Plaintiffs allege that Salansky held the roles of FMO, IC, and DO simultaneously, in violation of NPS policies. Compl. ¶ 68. However, these policies leave to the discretion of the IC whether and when to appoint a DO, contingent on the IC's judgment as to the complexity and anticipated duration of a fire.

The Redbook provides that FMOs "are responsible to provide DO coverage during any period of predicted incident activities," ECF 1-8 at 82, but this guidance manual leaves the decision as to when that will be to the judgment of the FMO. Moreover, the express language of the FMP vests the FMO with discretion in deciding whether to appoint a Fire Duty Officer: "The Fire Management Officer is responsible for *determining the need for* and assignment of the Fire Duty Officer." ECF 1-7 at 40, Table 6 (emphasis added). It further provides that DO "coverage will be implemented during periods of *anticipated prolonged increased* fire danger." *Id.* (emphasis added). The FMP does not set forth a specific course of action that an FMO must follow in assessing whether an increased fire danger is expected, and, if so, for what duration.

Even if this Court finds that these policies imposed a specific requirement that Salansky assign a DO for the Chimney Tops 2 Fire, the Park Service's violation of these directives is not

the source of Plaintiffs' injuries.  Courts broadly recognize that the violation of a specific and mandatory directive does not defeat application of the discretionary function exception unless the injury is based upon that violation.  *See*, *e.g.*, *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1285 (9th Cir. 1998) (a plaintiff cannot circumvent the exception through "mislabeling and misdescription of the truly discretionary source of the injury."); *see also Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 286-87 (3d Cir. 1995) (en banc).[6]  Rather, a court must determine for itself what act or omission the plaintiff's claim truly is "based upon"—that is, the "injury-causing" conduct or decision.  *Fisher Bros.*, 46 F.3d at 286-287; *see also In re Katrina Canal Breaches Litig*., 696 F.3d 436 (5th Cir. 2012) (in action brought by Hurricane Katrina victims citing violation of National Environmental Policy Act ("NEPA") policies mandating certain studies, dismissal was properly based on finding that the agency "retain[ed] substantive decision-making power regardless" of what it may have learned during the mandatory NEPA process).[7]

Plaintiffs do not allege that Salansky wearing too many hats *in and of itself* caused their injuries.  Rather, Plaintiffs allege that "if Salansky had designated others to be the IC or DO from Park personnel or elsewhere, the required process *would likely have produced policy oversight and the system of checks and balances required and necessary to assess and manage the fire-*

---

[6]  In *Fisher Bros.*, plaintiffs tried to circumvent the discretionary function exception by pointing to the failure of food inspectors to follow mandatory procedures in testing plaintiffs' supply of grapes, which were found to have traces of cyanide and were banned in the discretion of the agency Commissioner.  The court determined that – despite the allegations in the complaint – plaintiff's lost inventory was "caused by the Commissioner's decisions and, as a matter of law, their claims are therefore 'based upon' those decisions," and not a violation of the mandatory testing procedures.  *Fisher Bros.* 46 F.3d at 286.

[7]  *See also Gen. Dynamics*, 139 F.3d at 283 ("Courts are not required to, and should not, simply look at the surface of a complaint for the purpose of ascertaining the true basis of an attack upon something the government has done.").

*suppression response and make fire-related decisions*."  Compl. ¶¶ 70 (emphasis added).  Thus, the source of Plaintiffs' injuries – *i.e.*, the acts or omissions their claims are based upon – is the Park Service's allegedly negligent suppression of the Chimney Tops 2 Fire.  If discretionary conduct – here, fire suppression – is undertaken "without following mandated procedures, it is an abuse of discretion and, as such, protected from judicial review. . . ."  *Rosas v. Brock*, 826 F.2d 1004, 1010 (11th Cir. 1987).[8]

Therefore, even if agency policies forbade Salansky from simultaneously fulfilling the IC and DO roles, they do not defeat the discretionary function exception because they did not mandate that the Park Service suppress the Fire in a specific way and within a specified period of time.  "[T]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion."  *Miller*, 163 F.3d at 595.

### iii.  Use of WFDSS (Compl. ¶¶ 73-84)

Plaintiffs allege that the Park Service violated mandatory directives to utilize the WFDSS during the Chimney Tops 2 Fire.  Compl. ¶ 83.  The WFDSS is a "web-based program which must be used to assess and document the response to a wildfire."  Compl. ¶ 73.  According to Plaintiffs, WFDSS "assesses and documents response to wildfires in the following manner: (1) describes and analyzes the fire situation, (2) develops incident objectives and requirements, (3) develops a course of action, (4) evaluates relative risk, (5) completes an organization assessment,

---

[8] Other courts also have characterized such conduct as an abuse of discretion.  *See, Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 390 (D.C. Cir. 1983); *Mahon v. United States*, 742 F.3d 11, 15-16 (1st Cir. 2014) (holding a failure to perform mandatory risk-management assessments of government property did not defeat exception, because agency had discretion regarding what, if any, measures to take had it performed such assessments and discovered dangerous conditions).

14

(6) documents the rationale and (7) publishes a decision." *Id.* ¶ 74. They allege that the system provides "critical" fire information and generates "decisions" that "document fire management strategies, estimated costs relative to fire management, and ensure that strategic plans to manage a fire are subject to oversight as well as checks and balances." *Id.* ¶¶ 75-76.

Plaintiffs allege that the Fire Management Plan directs fire managers to use the WFDSS on each wildland fire to document the decision-making process and outline the strategy and tactics employed. Compl. ¶¶ 78-79. Although the Fire Management Plan states that WFDSS or its "equivalent" is to be used on each wildfire, the same paragraph of the FMP provides a key qualification: "The level of decision support documentation required will depend on the fire response level." FMP, ECF 1-7 at 30. According to the FMP, use of WFDSS is called for during an "extended attack." FMP § 4.1.3, ECF 1-7 at 47 ("Extended attack action requires a structured decision process (WFDSS) to guide the ongoing effectiveness and re-evaluation of suppression strategies."). Section 4.1.3 defines an "extended attack" to be "when objectives have not been met in the case of initial fire response, and/or where a fire managed for multiple objectives requires resources outside the immediate pool of available to sustain long term management objectives." *Id.* Accordingly, the language of § 4.1.3 unambiguously affords discretion to Park Service officials to determine whether an "extended attack," and thus use of the WFDSS, is necessary based on their *judgments* whether initial fire response objectives have been satisfied, and/or whether multiple objectives demand additional resources to sustain long-term management goals. Indeed, even assuming that WFDSS was required once the Park Service was in an "extended attack," "the decision whether the antecedent condition exists"— *i.e.*, whether initial objectives have been satisfied or multiple objectives demand additional resources—"afforded sufficient discretion to satisfy the first prong of the *Gaubert* test." *A.O.*

*Smith Corp.*, 774 F.3d at 365-66; *Myers v. United States*, 17 F.3d 890, 895 (6th Cir. 1994) (conduct of inspectors from Mine Safety and Health Administration involved discretion to satisfy first *Gaubert* prong because their instructions followed an "'if/then' logical structure" that required inspectors to make particular preliminary assessments involving judgment or choice prior to acting). Further, Plaintiffs do not cite any directive specifically mandating *when* Park Service officials must transition to an "extended attack" and accordingly utilize the WFDSS.

Plaintiffs also allege that RM-18 provides that "Parks will use the current decision support process (e.g. [WFDSS]) to *guide* and document wildfire management decisions." Compl. ¶ 79 (emphasis added). Even assuming RM 18 is mandatory and binding upon the Park Service (which it is not), the language cited is not sufficiently specific to defeat the discretionary function exception because it does not precisely prescribe how Park Service officials must use the WFDSS information during their decision-making.

Moreover, Plaintiffs have not identified any directive that required the Park Service to fight the Chimney Tops 2 Fire in a specific manner based on information generated by the WFDSS. Fire Management Plan § 4.1.3 expressly states that the WFDSS is intended to "guide" the fire suppression strategy; it does not mandate particular action. FMP, ECF 1-7 at 47. Put simply, even if at some point during the Chimney Tops 2 Fire Park Service officials exercised their discretion to shift to an "extended attack" and use of WFDSS was compulsory, Plaintiffs have not identified any directive mandating that Park Service employees use the WFDSS information in a specific manner to combat the wildfire. Courts have widely recognized that such policy-based decisions are discretionary. *See, e.g.*, *Luther v. United States*, No. 2:11-cv-268, 2014 WL 1255292 (D. Utah Mar. 26, 2014) (rejecting argument that the Forest Service violated mandatory provision in failing to give priority to safety of public by, among other

16

things, not warning nearby residents of impending danger of fire spread by high winds, and concluding that Forest Service Manual did not supply mandatory and specific course of conduct).[9]

Indeed, even assuming that WFDSS was required once the Park Service was in an "extended attack," "the decision whether the antecedent condition exists"—*i.e.*, whether initial objectives have been satisfied or multiple objectives demand additional resources—"afforded sufficient discretion to satisfy the first prong of the *Gaubert* test." *A.O. Smith Corp.*, 774 F.3d at 365-66. In this circuit, a policy that involves an "if/then" logical structure, requiring an employee to determine whether some predicate condition exits before a mandatory directive applies, necessarily involves an element of judgment or choice. *Myers*, 17 F.3d at 895–96; *Jude v. Comm'r of Soc. Sec*., 908 F.3d 152, 160–61 (6th Cir. 2018) (same). Further, Plaintiffs do not cite any directive specifically mandating *when* Park Service officials must transition to an "extended attack" and accordingly utilize the WFDSS.

Regardless of the information the WFDSS may have generated, the Park Service retained policy-based discretion in deciding how to fight the Chimney Tops 2 Fire. While the failure to utilize the WFDSS during the Chimney Tops 2 Fire—as with the Army Corps' failure to follow mandated NEPA procedures in *In re Katrina Canal Breaches Litig*., 696 F.3d at 449-50—may

---

[9] Other cases are in accord. *See*, *e.g.*, *A.O. Smith Corp.*, 774 F.3d at 371 (decisions concerning "the allocation of limited agency resources, time constraints,…the availability of personnel with experience, and decisions relating to the amount of personnel to assign to a particular task… all are policy considerations that trigger the discretionary function exception."); *see also Fang v. United States*, 140 F.3d 1238 (9th Cir. 1998) (decisions regarding equipment to be kept at various park stations and where to locate personnel with particular level of emergency medical training were susceptible to policy analysis); *Kiehn v. United States*, 984 F.2d 1100 (10th Cir. 1993) (level of staffing to devote to rescue operations protected by discretionary function exception); *Johnson v. United States*, 949 F.2d 332 (10th Cir. 1991) (discretionary function exception shielded decision concerning level of resources to allocate to rescue operations).

have caused the Park Service to make decisions without having fully "inform[ed] their discretion," the Park Service "retain[ed] substantive decisionmaking power regardless" of what it might have been learned from the WFDSS. Indeed, although the failure to make such decisions without the benefit of using WFDSS might have constituted an abuse of discretion, that is "an abuse explicitly immunized by the" discretionary function exception. *Id.*

### iv.    Notifications and Dissemination of Fire Information (Compl. ¶¶ 46-51)

Plaintiffs allege that the Park's Fire Management Plan imposed requirements that the Park Service warn Park neighbors, visitors, and local residents of the danger presented by the Chimney Tops 2 Fire. Compl. ¶¶ 46-48. But those policies do not contain any specific and mandatory directives which cabin the NPS's discretion in communicating information about a fire.[10]

Plaintiffs specifically cite to language found in Section 3.3.2 and in Table 13 in Section 4.4.2 of the FMP. *Id.* Those provisions, however, only call on the Park Service to "notify" the public, visitors, and Park neighbors of "planned or unplanned fire management activities that have the potential to impact them," FMP § 3.3.2, to "post current fire information on websites as available," FMP Table 13, and to "inform park neighbors of wildland fires," *id.*

Section 3.3.2 affords the Park Service discretion to decide what conduct constitutes "planned and unplanned fire management activities." ECF 1-7 at 25. It does not specify what

_____

[10] In five related cases, the Hon. Thomas J. Phillips decided that FMP Section 3.3.2 and Table 13 in Section 4.4.2 contain mandatory directives regarding notifications. *See Reed v. United States*, No. 3:18-cv-201, ECF No. 35. For the reasons set forth in this motion, the United States respectfully disagrees that this ruling is consistent with the Sixth Circuit's controlling precedent. Even if the decision is correct, however, Plaintiffs' failure to warn claim cannot survive a factual attack motion based on the discretionary function exception. In the five related cases, the United States has filed a renewed motion to dismiss for lack of subject matter jurisdiction factually attacking the plaintiffs' failure to warn claims.

conduct comes within the ambit of a "fire management activity," and thus cannot serve as a precise directive. *See Irving v. United States*, 162 F.3d 154, 165 (1st Cir. 1998) (explaining that a mandatory directive "must be unambiguous" and "unequivocally establish" the directives that a federal employee must adhere to); *Green v. United States*, 8 F. Supp. 2d 983, 992 (W.D. Mich. 1998) (ambiguity of regulation left room for judgment).

Section 3.3.2 also does not command *whether* such information is required under a given circumstance. Section 3.3.2 incorporates an "if/then" analytical structure by predicating the issuance of fire information to Park neighbors, visitors, and local residents on a discretionary determination that the activity "ha[s] the potential to impact" them. Thus, only *if* a judgment has been made that a fire management activity has the potential to impact them, *then* Park neighbors, visitors, and local residents are to be notified. The determination of "potential impact" turns not on some specific criteria required by Section 3.3.2, but instead on NPS officials' knowledge, experience, and judgment in carrying out fire management activities. As with the predicate determination at issue in *Jude*, the determination of potential impact here required NPS officials "to balance a 'plethora of factors' in a situation that required 'some degree of operational flexibility.'" *Jude*, 908 F.3d at 160–61.

Section 3.3.2 also affords NPS discretion in determining *who* receives notifications. Section 3.3.2 provides that the audience for fire management activity information is "Park neighbors, Park visitors and local residents." But Section 3.3.2 does not define these groups or set forth the "specific manner" in which a Park official must determine whether an individual or group falls into one of the categories for any given fire or at any given time. Park Service officials retain discretion in determining who falls within the scope of individuals or groups to receive such information. *See Irving*, 162 F.3d at 165 (a mandatory directive "must be

19

unambiguous" and "unequivocally establish" the directives to be followed).

Section 3.3.2 also affords the NPS discretion in determining *when* to disseminate information. As the Sixth Circuit has held, even a policy that states that an agency "shall immediately" take some action after a predicate condition exists does not remove an agency's discretion regarding the timing of the action. *Jude*, 908 F.3d at 160–61. Indeed, Section 3.3.2 contains no language relating to the timing of information, let alone any language that "fix[es] an exact period" for disseminating such information. *See id.*

Additionally, Section 3.3.2 does not mandate *how* the Park Service is to issue such information. For example, Section 3.3.2 does not specify whether the Park Service must issue information through mass media platforms or instead provide information in person. As such, Section 3.3.2 is discretionary as to the methods the Park Service may employ to provide information about fire management activities.

Finally, Section 3.3.2 is not specific as to *what* the notification must contain regarding fire management activities. Section 3.3.2 provides that the information will relate to "fire management activities," but beyond that the section is silent as to the specific contents of the information. Accordingly, the Park Service retains discretion under Section 3.3.2 as to the substance of information relayed related to fire management activities.

Section 4.4.2 of the FMP also lacks specific requirements regarding the Park Service's distribution of fire-related information. That section's title, "Wildland Fire Operational *Guidance*," demonstrates that the subsections that follow, including Section 4.4.2, contain guidance rather than mandatory directives. *See*, *e.g.*, *Riley*, 486 F.3d at 1033 (provisions of publication stated that it was intended as "guidance"). Moreover, the introduction to Section 4.4 of the FMP refers to the Park Service's fire prevention program "objectives" and is thus not a

mandatory directive. Accordingly, the "mitigation actions" listed in Table 13 under Section 4.4.2(F) are not mandatory directives, but instead set forth guidance in furtherance of the Park Service's wildland fire operational objectives.

But even if the "mitigation actions" listed in Table 13 are mandatory, the measures are not sufficiently specific to defeat the discretionary function exception. Plaintiffs allege that the following three mitigation actions listed in Table 13 under the category "Park Neighbors" constitute mandatory directives: (1) "Post current fire information on websites as available," (2) "Inform park neighbors of wildland fires," and (3) "Suppress those fires or parts there of that threaten to burn off of park property or that adversely impact public health and safety." FMP § 4.4.2(F); Compl. ¶ 49. These actions, however, necessitate judgment on the part of the Park Service regarding what information to provide, and whether, when, how, or to whom to do so (the third item above says nothing at all about the provision of information).

The guidance in Table 13 incorporates an "if/then" analytical structure requiring NPS officials to exercise discretion in determining *whether* to issue fire-related information. *See Myers*, 17 F.3d at 895–96. Table 13 advises NPS to "[p]ost current fire information on websites *as available*." FMP § 4.4.2 (emphasis added). The determination of what is "available" constitutes an exercise of judgment, and such discretionary determination is antecedent to the posting of fire information on websites. *See id.*; *see also Myers*, 17 F.3d at 895; *see also Rosebush*, 119 F.3d 438, 441 (6th Cir. 1997) ("[d]ecisions concerning what constitutes 'practicable' require the exercise of discretion…").

Table 13 also does not specify *when* the Park Service must issue fire information. As explained above, the instruction to "[p]ost current fire information on websites as available" allows Park Service officials to exercise discretion in determining when the information is

available.  *See Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 396 (6th Cir. 2004) (the phrases "at such times" and "to the degree necessary" provide discretion); *Jude*, 908 F.3d at 160–61 (period of time not mandated in regulation).

Additionally, the Park Service retains discretion in determining *how* to disseminate the information and notifications described in Table 13.  Table 13 recommends that the Park Service post current fire information "on websites."  FMP § 4.4.2.  Table 13 does not identify which "websites" must be used to post fire information, or specify how information officers must disseminate information.  The language in Table 13 amounts to guidance as to various means the Park Service may use to disseminate information, including through the use of the internet, but Table 13 does not limit the Park Service's use of other means of dissemination.  Accordingly, Table 13 does not contain a specific directive regarding how NPS must inform about fires.

Table 13 also affords discretion in determining *who* specifically should receive fire-related information.  Table 13 guides the NPS to "inform park neighbors of wildland fires," but the term "Park neighbors" is not defined in Table 13.  Such lack of specificity demonstrates that the determination of who the relevant "Park neighbors" are for purposes of a particular wildland fire notification may turn on a variety of factors that require "some degree of operational flexibility."  *Jude*, 908 F.3d at 160–61 (quoting *A.O. Smith*, 774 F.3d at 365).

Finally, Table 13 does not mandate the particular content of any fire-related information. The guidance to "post current fire information" is not precise as to the *substance* of "fire information" to be posted.  Additionally, the guidance to "inform park neighbors of wildland fires" does not denote whether Park neighbors simply should be informed of the existence of a fire, or should also be informed of the size, behavior, or other characteristics of a fire.  Because Table 13 does not include any specific requirements, information distribution determinations are

22

left to the discretion of Park officials.

### C.   The Second Prong of the *Gaubert* Test: the Challenged Conduct is Susceptible to Policy Analysis

As to the second prong of the *Gaubert* analysis, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.  "There is a *strong presumption* that the second part of this *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion." *A.O. Smith Corp.*, 774 F.3d at 365 (internal quotation omitted).

The focus of the second prong is not on an employee's "subjective intent in exercising the discretion conferred . . . but on the *nature* of the actions taken." *Gaubert*, 499 U.S. at 325 (emphasis added).  According to the Sixth Circuit, "[t]he requirement for a policy nexus is an objective, not a subjective one.  The proper inquiry is whether the challenged actions are '*susceptible to policy analysis*,' not whether they were the result of a policy analysis." *Rosebush*, 119 F.3d at 444 (quoting *Gaubert*, 499 U.S. at 325).  The Sixth Circuit also has held that "[t]he discretionary-function exception protects both high-level policymakers and the employees who implement broader governmental objectives." *Kohl v. United States*, 699 F.3d 935, 944 (6th Cir. 2012).

"[E]ven if there is *no* evidence that policy concerns were the basis of a challenged decision, the discretionary function exception applies if the decision is *susceptible* to policy analysis." *Rosebush*, 119 F.3d at 444 (emphasis in original); *see also Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir. 1986) (it is irrelevant that acting officials "valuated the pros and cons of requiring that a warning be given").  The Sixth Circuit recently confirmed this as the proper test: "Such 'social, economic, or political' policy analysis *need not have actually*

23

*occurred* in the disputed instance, but rather the decision need only have been *theoretically susceptible* to policy analysis." *Jude*, 908 F.3d at 159 (emphasis added).

It is widely recognized that how to attack a fire is a judgment that "involve[s] a balancing of considerations, including cost, public safety, firefighter safety, and resource damage, and these considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect." *Backfire 2000*, 273 Fed. App'x. at 662 (internal quotation omitted); *see also Miller*, 163 F.3d at 596; *Parsons*, 811 F. Supp. at 1420 (establishing priorities on staffing and resources requires "social and economic policy decisions.") (quoting *Defrees v. United States*, 738 F. Supp. 380, 385 (D. Or. 1990)).[11]

The Sixth Circuit's statement that the challenged conduct need only be "*theoretically susceptible*" to policy analysis applies equally to Plaintiffs' failure to warn claim. Decision-making regarding issuance of fire-related information is susceptible to myriad policy considerations. Recognizing public safety as a top priority, decisions about disseminating fire-related information also may require contemplation of firefighter safety, budget, potential impact of the information on the public, and allocation of limited agency resources available to disseminate information. *See e.g.*, *Rosebush,* 119 F.3d at 443 (decision relating to warning of potential danger shielded by discretionary function exception); *Lockett v. United States*, 938 F.2d at 639 (same)*; Loughlin v. United States*, 393 F.3d 155, 164 (D.C. Cir. 2004) (same). The challenged conduct here satisfies this test.

---

[11] The Park Service's policies are replete with policy considerations that are implicated in wildfire suppression efforts, including firefighter and public safety, costs, environmental impacts, and availability of resources. *See, e.g.*, FMP, ECF 1-7 at 30; DO-18 at 6 (same); Redbook, ECF 1-8 at 27 (same).

## CONCLUSION

For these reasons, Plaintiffs' lawsuit is barred in its entirety by the FTCA's discretionary function exception. This Court should dismiss this action for lack of subject matter jurisdiction.

Dated: February 7, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

THOMAS G. WARD
Deputy Assistant Attorney General

MATTHEW J. GLOVER
Counsel to the Assistant Attorney General

JAMES G. TOUHEY, JR.
Director, Torts Branch

DEBRA R. COLETTI
Assistant Director, Torts Branch

*/s/ Theodore W. Atkinson*
THEODORE W. ATKINSON
MARTIN F. ST. AUBIN
GRANT E. TREASTER
Trial Attorneys, Torts Branch
United States Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C. 20044
Telephone: (202) 616-4266
Email: theodore.atkinson@usdoj.gov

Attorneys for Defendant

25

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2020, I electronically filed the foregoing with the Clerk of Court via the Court's Electronic Filing System, which will provide electronic notification to all Filing Users.  Any parties who are not Filing Users will be served with a paper copy of the foregoing by first-class mail, postage pre-paid.

*/s/ Theodore W. Atkinson*
THEODORE W. ATKINSON
